```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

v.                                                             OPINION AND ORDER

DWIGHT REID, also known as Dick Wolf,                          20-CR-00626 (PMH)
CHRISTOPHER ERSKINE, also known as
Beagle,

                         Defendants.
-----------------------------------------------------------X
```

PHILIP M. HALPERN, United States District Judge:

Pending before the Court are the post-trial motions filed by Dwight Reid ("Reid") and Christopher Erskine ("Erskine" and together, "Defendants"), requesting, pursuant to Federal Rule of Criminal Procedure 29 that the Court set aside the jury's guilty verdict and enter a verdict of acquittal; or alternatively, pursuant to Federal Rule of Criminal Procedure 33 that the Court set aside the jury's guilty verdict and order a new trial. (Doc. 815; Doc. 845).

Based upon the parties' written submissions and for the reasons set forth below, Defendants' motions are DENIED.

## BACKGROUND

On November 23, 2020, a grand jury sitting in the Southern District of New York returned an indictment in this case charging Reid, Erskine, and 16 other co-defendants with a litany of crimes in relation to their involvement in a prison and street gang known as the Untouchable Gorilla Stone Nation ("Gorilla Stone"). (Doc. 1). Each of Defendants' co-defendants entered guilty pleas. The grand jury thereafter on August 15, 2023 returned superseding Indictment S10 20 Cr. 626 (the "Indictment") charging Reid and Erskine with racketeering conspiracy in violation of 18 U.S.C. §§ 1962(d) and 1963 ("Count One"), narcotics trafficking conspiracy in violation of 21 U.S.C. § 846 ("Count Three"), and possession of a

firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count Four"); and also charging Erskine alone with possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) ("Count Two"). (Doc. 696).

The Court, on February 22, 2023, entered an Amended Pretrial Scheduling Order which directed, *inter alia*, that Rule 404(b) evidence (if any) was to be disclosed by no later than August 31, 2023. (Doc. 590). The Government took the position on the record during a September 11, 2023 conference and in written letters on September 19 and 20, 2023, that it would not offer any Rule 404(b) evidence at trial. (*See* Sept. 11, 2023 Min. Entry; Doc. 722; Doc. 721-1). The Government's September 19, 2023 letter (the "Enterprise Letter") identified nineteen acts that the Government might seek to prove at trial as direct evidence of, among other things, the nature and existence of the racketeering enterprise, Defendants' leadership positions, the pattern of racketeering activity engaged in by Defendants and their co-conspirators, and the motives that drove Defendants and co-conspirators to engage in the criminal activities charged. (Doc. 721-1).

The Court's Second Amended Pretrial Scheduling Order directed the parties to, *inter alia*, meet and confer and agree, to the extent possible, on proposed *voir dire*, requests to charge, and a proposed verdict sheet. (Doc. 711). The parties submitted their joint pretrial filings on September 22, 2023 and represented that they were in full agreement as to the proposed requests to charge and proposed verdict sheet. (Doc. 730). Also on September 22, 2023 pursuant to the Second Amended Pretrial Scheduling Order, the parties filed motions in *limine*. (Doc. 728; Doc. 729; Doc. 731). Defendants argued *in limine*, *inter alia*, that certain of the acts in the Enterprise Letter were not admissible as direct proof and should be precluded on Rule 404(b) grounds. At the final pretrial conference on October 23, 2023, the Court denied that branch of the motions,

concluding that each of the nineteen acts in the Enterprise Letter was admissible as direct evidence of the racketeering conspiracy charged in Count One. (*See* Min. Entry Oct. 23, 2023; Transcript of Oct. 23, 2023 Proceeding ("Oct. 23, 2023 Tr.") at 10:13-20).

After *voir dire* and jury selection on October 30, 2023, the Court heard witness testimony and received evidence over the course of the eleven-day trial. (*See generally* Trial Transcript, "Tr."). The Government called more than thirty witnesses in its case-in-chief. As relevant to Defendants' instant motions, the Government called two cooperating witnesses and former Gorilla Stone members: Walter Luster ("Luster") and Nico Crudup ("Crudup"). Crudup, who had joined Gorilla Stone when he was sixteen years old, testified about, among other topics, the events leading up to the September 2020 shooting of a fifteen-year-old in Poughkeepsie, New York (the "2020 Poughkeepsie Murder"). Luster, who testified for over two full days of trial, explained the hierarchy of Gorilla Stone, its members and their relative positions within the gang, and provided information and context for many exhibits introduced at trial.

The Court held a charging conference on November 9, 2023 and, after making some agreed-upon modifications to the parties' joint proposed jury charges, charged the jury on November 13, 2023. The jury retired to deliberate on November 14, 2023 and on November 15, 2023, returned a verdict convicting Reid of Count One (racketeering conspiracy) and Count Three (narcotics trafficking conspiracy); and convicting Erskine of Count One (racketeering conspiracy), Count Two (possession with intent to distribute crack cocaine), and Count Three (narcotics trafficking conspiracy). Reid was not charged with Count Two, and Reid and Erskine were found not guilty of Count Four (possession of a firearm in furtherance of a drug trafficking crime). (Doc. 842-1).

With respect to Count One, the jury found that the pattern of racketeering in which Reid and Erskine engaged involved either (a) 280 or more grams of crack cocaine, (b) 5 kilograms or more of cocaine, or (c) 1 kilogram or more of heroin. With respect to Count Two, the jury found that the Erskine possessed with intent to distribute less than 28 grams of crack cocaine. With respect to Count Three, the jury found that Reid and Erskine conspired to distribute 280 grams or more of crack cocaine, 500 grams or more but less than 5 kilograms of cocaine, and less than 100 kilograms of marijuana. (*Id.*). Reid's sentencing is scheduled for May 21, 2024 and Erskine's sentencing is scheduled for May 23, 2024.

Pursuant to the briefing schedule entered by the Court, Reid filed his post-trial motion on February 6, 2024 (Doc. 815), and Erskine filed his on March 25, 2024 (Doc. 845). The Government opposed the motions on March 7, 2024 (Doc. 842) and April 24, 2024 (Doc. 862), respectively. Reid filed reply, without the Court's permission, on April 1, 2024. (Doc. 848).

## STANDARD OF REVIEW

I. Federal Rule of Criminal Procedure 29

Federal Rule of Criminal Procedure 29(a) directs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "[A] district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Berry*, No. 20-CR-00084, 2022 WL 1515397, at *3 (S.D.N.Y. May 13, 2022) (Nathan, J.).[1] Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

---

[1] Unless otherwise noted, all case quotations omit internal quotation marks, citations, alterations, and footnotes.

The Court, when assessing the sufficiency of the evidence supporting a guilty verdict, "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). Therefore, a defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial "bears a heavy burden" when bringing a Rule 29(a) motion. *Id*. "[T]he evidence must be viewed in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), "since one fact may gain color from others," *Berry*, 2022 WL 1515397, at *3. This is an "exceedingly deferential standard of review." *United States v. Pica*, 692 F.3d 79, 86 (2d Cir. 2012).

II. Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Phillips*, No. 22-CR-00138, 2024 WL 1300269, at *3 (S.D.N.Y. Mar. 27, 2024) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). "[M]otions for a new trial are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Accordingly, "the court must examine the entire case, take into account all facts and circumstances, and make an

5

objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021).

## ANALYSIS

Reid makes six arguments in support of his post-trial motions: (1) Luster's testimony was so lacking in credibility that no reasonable juror could have believed him; (2) special interrogatories should have been used to choose what predicate acts constituted the racketeering conspiracy; (3) the verdict sheet is inconsistent between Count One and Count Three; (4) the Court improperly permitted the introduction of Rule 404(b) evidence; (5) a certain jury charge was one sided and prejudicial; and (6) one of the jurors ("Juror No. 8") potentially harbored racial or other bias. (*See* Doc. 815).

Erskine makes three arguments in support of his post-trial motions: (1) Luster lacked credibility such that no reasonable juror could have believed him; (2) there was insufficient evidence to support the narcotics convictions, and even if a narcotics conspiracy had been sufficiently established, the quantity of narcotics was not; and (3) the Government allegedly committed a *Brady* violation. (*See* Doc. 845).

The Court first addresses Luster's testimony and thereafter analyzes each of Defendants' additional arguments *seriatim*.

I. Walter Luster's Testimony

Reid and Erskine both contend that Luster's testimony was so unbelievable that no reasonable jury could have found him to be a credible witness. "It is the province of the *jury*[,] and not of the court[,] to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the

essentials of his testimony." *United States v. Robinson*, 749 F. App'x 35, 37 (2d Cir. 2018) (quoting *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011)). "Accordingly, we do not second–guess a jury's apparent decision to credit a witness's testimony except in extreme cases where the testimony was 'incredible as a matter of law,' meaning it was 'incredible on its face' or it 'def[ied] physical realities.'" *Id*. (quoting *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012)). Luster's testimony was not incredible as a matter of law.

Reid and Erskine argue that Luster's testimony concerning the 2020 Poughkeepsie Murder was inconsistent with Crudup's testimony. Specifically, they argue that Luster's testimony that he had no involvement in the 2020 Poughkeepsie Murder, did not know Crudup, and that the 2020 Poughkeepsie Murder was conceived of, orchestrated by, and carried out by co-conspirator Brandon Soto ("Soto") and Crudup, was contradicted by Crudup. It is therefore impossible, according to the argument, for the jury to have credited both Luster and Crudup. Erskine adds that Luster was incentivized to lie at trial, while Crudup had no such incentive, and therefore Luster's testimony must be discredited.

Luster did testify that he did not order the 2020 Poughkeepsie Murder or know about it until months later, but that testimony was actually corroborated by Crudup's testimony and other evidence admitted at trial. In particular, Luster testified that Soto, also known as "Stacks," was in charge of Money Gang in Poughkeepsie (Tr. at 965),[2] and that "Stacks" reported to both him and "Don" (i.e., co-defendant Deshawn Thomas) (*id*. at 1242-1243). Crudup likewise testified that "Stacks" was the leader of the Poughkeepsie-area "district" of Money Gang. (*Id*. at 58, 80). Luster testified that he had made an announcement at a gang meeting in the summer of 2020 about, among other things, a dispute with rival gang, Sex Money Murder ("SMM"), also called

---

[2] Gorilla Stone is comprised of eight different "Caves," each of which has its own leadership hierarchy. (Tr. at 861-864). The Money Gang is one such Cave. (*Id*.).

the "Blazes." (*Id*. at 1248). Crudup similarly testified that in August 2020, "Shells" (i.e., Luster) led a gang meeting in Westchester and that at that meeting, Luster had announced that it was "up for the Blazes." (*Id*. at 86). As Crudup explained, however, the 2020 Poughkeepsie Murder concerned retaliation against Bully Hard for stabbing Crudup—a different gang than SMM or the Blazes. (*Id*. at 75-79, 101-107). Crudup testified that it was at that August 2020 meeting that Luster asked him "about the situation with Bully Hard . . . And he told me that it will be handled." (*Id*. at 86). While Luster had initially testified that he did not know Crudup (*id*. at 1166, 1242), he later testified that it was "possible" he spoke to Crudup at a gang meeting after Crudup was stabbed. (*Id*. at 1247).

Contrary to Defendants' arguments on this motion, Crudup did not testify that Luster was involved in the 2020 Poughkeepsie Murder. Crudup testified that the 2020 Poughkeepsie Murder was done at Soto's direction (*id*. at 101-107), that Soto told Crudup what to do after the murder, that Soto drove him to Brooklyn where Crudup went into hiding for a few weeks, and that Soto and other gang members burned the car that he had been driving the day of the murder in an effort to destroy evidence of the shooting. (*Id*. at 104-111, 117-118). With respect to Luster, Crudup testified that "Stacks" said that he would ask "Shells" for a gun for Crudup. (*Id*. at 130). Luster, consistent therewith, testified that "Stacks" called him at some point in the summer of 2020 asking for a gun. (*Id*. at 1251). Luster also testified that he did not have any conversations with "Don" or "Stacks" about the 2020 Poughkeepsie Murder or the subsequent coverup. (*Id*. at 1259-1260). Although Crudup testified that "Stacks" said "he was given the green light from the higher-ups to retaliate" with respect to the Bully Hard stabbing (*id*. at 83), he did not testify that Luster was one of the "higher-ups" to which Stacks was referring. Moreover, Luster's testimony

8

is consistent with messages exchanged between Thomas and Soto after Crudup was stabbed. (*See* GX 1616 at 19-21, GX 1616-G, GX 1616-E, GX 1616-F; Tr. at 837).

A review of the testimony of both Luster and Crudup as a whole reveals largely consistent stories and, in any event, "'[t]he proper place for [such run–of–the–mill] challenge[s] to a witness's credibility is in cross-examination and in subsequent argument to the jury, not in a' request for post-trial relief from a verdict." *Robinson*, 749 F. App'x at 37 (citing *Truman*, 688 F.3d at 139 (alterations in original)). Even when inconsistencies in a witness's testimony are exposed on cross-examination, "the jury [i]s entitled to weigh the evidence and decide the credibility issues for itself." *O'Connor*, 650 F.3d at 855 (citing *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009)).

Erskine argues Luster's testimony concerning his knowledge of Erskine supplying cocaine, selling drugs, carrying guns on his block, and holding gang meetings was uncorroborated. However, a challenge to the weight of the evidence—such as the one Erskine makes—is for the jury, and is not grounds for Rule 29 and/or Rule 33 relief. *Diaz*, 176 F.3d at 92. "[A]ny lack of corroboration goes only to the weight of the evidence, not to its sufficiency. The weight is a matter for argument to the jury, not a ground for reversal on appeal." *Roman*, 870 F.2d at 71.

Erskine also argues that Luster's alleged misidentification of the building super in a photo undercuts Luster's claim that he was close with Erskine as well as the Government's theory at trial that Erskine had an "underground" tunnel system in his building's basement where his drug operation was conducted. Erskine proffers, in support of this argument, the affidavit of the person whom Luster identified as the superintendent of the buildings at issue, who swears that he was not the superintendent of the buildings. (Doc. 845-1). Erskine did not call this

9

individual as a witness at trial, and does not argue that this testimony is newly discovered evidence. The decision by counsel as to whether and which witnesses to call at trial is a "tactical decision of the sort engaged in by defense attorneys in almost every trial," *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987), and is one "which courts will practically never second-guess," *United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974). And in any event, relief of the sort requested by Erskine to the extent it is based on newly discovered evidence requires a showing that "the evidence is not merely cumulative or impeaching; and . . . would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 407 (2d Cir. 2015). Erskine has not made such a showing.

Reid and Erskine also argue that because the jury did not find them guilty of Count Four or find the special interrogatory about heroin in Count Three, the jury must have rejected Luster's testimony. Even if the jury's verdict indicated that the jury found Luster's testimony on heroin trafficking and/or firearms incredible in whole or in part, the jury was not precluded from crediting Luster's testimony on other topics.[3] "[T]he jury is free to believe part and disbelieve part of any witness's testimony[.]" *Josephberg*, 562 F.3d at 487. Put simply, under these circumstances—where Luster's testimony was not incredible on its face or as a matter of law and largely consistent with Crudup's—this Court will not second-guess the jury's apparent credibility determination.

---

[3] The Court so charged the jury that it "may accept so much of the witness's testimony as you deem true and disregard what you feel is false." (Tr. at 1661).

II.      Dwight Reid's Additional Arguments

    A.  Rule 404(b) Evidence

Reid also contends that the Court permitted the introduction of Rule 404(b) evidence "as though it was direct evidence of racketeering acts." (Doc. 815 at 9). Reid does not in this motion specify what evidence he believes was improperly admitted at trial. To the extent Reid's argument concerns the evidence outlined in the Enterprise Letter, the Court already determined that such evidence was not Rule 404(b) evidence when it denied Defendants' motion *in limine* which sought its preclusion, on the grounds that it could be admitted as direct evidence of the racketeering conspiracy. (*See* Doc. 731-1; Doc. 728; Doc. 729; Doc. 740; Oct. 23, 2023 Tr. at 9-10). Nothing has occurred to suggest that the *in limine* analysis then should be modified now. To the extent that Reid's argument on this front is nothing more than an untimely attempt to seek reconsideration of the Court's *in limine* rulings, it is made without any basis provided for such relief, and is therefore denied.

    B.  Verdict Sheet

Reid takes issue with the failure to present the jury with special interrogatories to identify the predicate acts that the jury found constituted racketeering conspiracy. A verdict sheet need not require the jury to answer such special interrogatories. *United States v. Johnson*, 861 F. App'x 483, 488 (2d Cir. 2021) (The Second Circuit has "rejected a requirement that juries answer 'special interrogatories as to which specific predicate acts each defendant agreed would be committed.'" (citing *United States v. Applins*, 637 F.3d 59, 82-83 (2d Cir. 2011))). In any event, the form specified that a "pattern of racketeering activity" was required; the Court instructed the jury that the Government was required to prove that the defendants "knowingly conspired or agreed to participate in the conduct of the affairs of the enterprise through a pattern

11

of racketeering activity" (Tr. at 1704); and that the jury "must be unanimous as to which type or types of predicate racketeering activity the defendant agreed would be committed[.]" (Tr. at 1710). "Because we presume that a jury follows the instructions of the court," *Johnson*, 861 F. App'x at 488, and Reid does not present any argument as to "what the jury might have considered sufficient," *id*., his contention regarding special interrogatories is unpersuasive.

Reid also argues that the verdict sheet is "inconsistent" between Count One and Count Three, arguing that the jury found with respect to Count One that Reid conspired with others to distribute heroin while finding with respect to Count Three that he did not conspire to distribute heroin. The verdict sheet, however, did not require the jury to specify which of the three narcotics listed were involved in the pattern of racketeering activity. (*See* Doc. 842-1). The jurors found Reid guilty of racketeering conspiracy involving the distribution of cocaine base, cocaine, *or* heroin (disjunctive) in the specified amounts. (*Id*.). The jurors were not required to and did not specify which of the three were involved. (*Id.*). The jurors then found with respect to Count Three that Reid did not conspire to distribute heroin. Thus, there is no inconsistency, let alone an "obvious inconsistency" (Doc. 815 at 10) between the verdicts in Count One and Count Three. It is worth repeating that both Defendants' counsel agreed to the form of the verdict sheet before it was given to the jury. (*See* Doc. 730).

C. <u>Jury Charge</u>

Reid contends that "the jury charge on page 45 was totally one sided and prejudicial" (Doc. 815 at 9), presumably referring to the instruction given at Part III(G)(5) of the written instructions concerning racketeering predicates, generally. (*See* Tr. 1710-1712). Reid has not advanced any substantive argument about his purported concern with the charge. This instruction was included in the Joint Proposed Requests to Charge (Doc. 730-1 at 34-35) to which all parties

12

were "in full agreement." (Doc. 730). No objections were lodged at that time, nor at trial when the Court circulated the charge it intended to read, nor after the jury was charged and before retiring to deliberate. Accordingly, Reid's argument concerning the jury charge fails.

D. Juror No. 8

On November 1, 2023, the Court advised the parties that it received a note from Juror No. 8 the evening prior, provided copies to counsel, and read the note into the record. The note stated, in sum and substance, that in 2020 a person was killed outside Juror No. 8's office in New Rochelle and that "[h]e believes it to be Blood related." (Tr. at 162). The Court then provided counsel an opportunity to give their proposals as to what, if anything, was necessary to be done in light of Juror No. 8's note. (*Id*. at 163-165). Counsel for Erskine requested that the Court confirm that Juror No. 8 could still be fair and impartial and otherwise voiced no concern. (*Id*.). Reid's counsel did not make any suggestions. The Court engaged with Juror No. 8 in the colloquy requested by Erskine's counsel (*id*. at 166). Neither Defendants' counsel made any objection to the procedure and they requested nothing further from the Court.

Reid now contends that Juror No. 8 "potentially harbored racial or other bias" (Doc. 815 at 10). This belated contention is based on some "investigation" that the person killed outside Juror No. 8's office was a "young African American individual [who] was gunned down by the police" and that because "[t]here is no indication in the news reports from the time of any gang connection," Juror No. 8 must have been racially biased. (*Id*.). The responses given by Juror No. 8 to the Court's questions were sufficient to abate any such concern. "[T]he Court concluded then, and continues to believe now, that no sound basis exists for a finding that Juror No. [8] operated under any sort of bias, inferable or otherwise, that prevented him from engaging in his duties as a juror in a fair and impartial manner." *United States v. Adeniyi*, No. 03-CR-00086,

13

2004 WL 1077963, at *6 (S.D.N.Y. May 12, 2004). In any event, as discussed above, because of Reid's failure to raise any challenge during trial, the Court deems this belated objection waived. *See, e.g., McCrory v. Henderson*, 82 F.3d 1243, 1249 (2d Cir. 1996) (failure to raise *Batson* challenge during jury selection, when it can be cured, waives the challenge); *United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994).

Reid has failed establish that no rational trier of fact could have found him guilty beyond a reasonable doubt in order to meet the "heavy burden" associated with Rule 29 relief. *Coplan*, 703 F.3d at 62. Likewise, Reid has failed to convince the Court that letting the "guilty verdict stand would be a manifest injustice." *Landesman*, 17 F.4th at 330. Accordingly, Reid's motion under Rules 29 and 33 for an order setting aside the jury's guilty verdict is denied.

III. Christopher Erskine

A. Narcotics

Erskine also argues that insufficient evidence supported the narcotics convictions, and that even if a narcotics conspiracy had been sufficiently established, the quantity of narcotics was not. He bases these arguments on his interpretation of text messages and communications between and among co-conspirators that were introduced at trial; and he points to a lack of direct evidence of his involvement in any narcotics distribution activities. These arguments "ignore[ ] the existence, and relevance of, the circumstantial evidence." *United States v. Varanese*, 417 F. App'x 52, 54 (2d Cir. 2011). The Government's evidence at trial also included numerous recordings of Erskine and his co-conspirators discussing their membership in Gorilla Stone and the gang's activities, including drug dealing, over the phone and during recordings of conversations. In addition to social media and phone evidence, there was substantial evidence including photographs and videos, recorded calls and prison visits, witness testimony, and other

14

narcotics-related evidence that Gorilla Stone functioned as a gang involving large scale narcotics trafficking. (*See, e.g.,* Tr. at 400-401, 683-687, 830, 975, 995, 1009, 1012-1014, 1019-1020, 1028-1029, 1117, 1154, 1368; GX 153-AT; GX 223-T; GX 516-A; GX 601-AT; GX 606-AT; GX 607-AT; GX 609-AT; GX 1206; GX 1206-A; GX 1307; GX 1404 at 57-58, 76; GX 1408 at 109; GX 1604; GX 1609-101; GX 1609-102; GX 1616; GX 2101). "Even assuming that [Erskine] has posited a plausible counter-interpretation of the evidence, the jury was not compelled to accept it where, as here, there was sufficient evidence to support the government's interpretation of the evidence." *Phillips*, 2024 WL 1300269, at *23.

Erskine argues with respect to Count Two that Detective John Marchioni, who the Government called to testify concerning the Confidential Informant involved in thirteen purchases of crack cocaine from Erskine's co-defendant Naya Austin, did not sufficiently establish his positive identification of Erskine on August 10, 2020. He further argues that evidence concerning the phone number 201-253-7207 was insufficiently probative concerning Erskine's distribution of crack cocaine because there was no evidence linking the 201 number to Erskine.

Detective Marchioni testified that he believed that the person he saw on August 10, 2020 outside Erskine's residence was Erskine. (Tr. at 414). Though it does not appear that the Government formally associated the 201 number with Erskine (*see* GX 2102), the Government proffered sufficient evidence corroborating Detective Marchioni's testimony that he observed Erskine's co-defendants Jordan Campbell and Jordan Ingram meeting up with Erskine in connection with the Confidential Informant's purchase of crack cocaine from Austin. For instance, Austin's car GPS records demonstrated that Austin's car drove to Erskine's address when Detective Marchioni observed the car there (GX 2202; GX 2202-2); Austin's text

15

messages to co-defendant Jordan Campbell in which she sent Erskine's exact address right before Campbell went to Brooklyn from Peekskill (GX 1016; GX 1016-G); and Investigator James Ossipov's tracking of Austin's car that day, when the car spent four minutes on Erskine's block after making the trip from Peekskill to Brooklyn (GX 2202-2). Viewing the totality of the evidence in conjunction, not in isolation, in the light most favorable to the government, and crediting every inference that could have been drawn in the government's favor, the evidence introduced at trial was more than sufficient to support the Count Two conviction.

Erskine further argues that if the Court finds, as it has, that the jury's Count Three narcotics conspiracy conviction should not be disturbed, then it should find that the Government did not sufficiently prove the quantity of narcotics involved.

With respect to cocaine base, the jury found that Erskine conspired to distribute or possessed with intent to distribute 280 grams or more of mixtures and substances containing a detectable amount of cocaine base. (Doc. 842-1). Erskine argues that the Government only proved it recovered 234.053 grams of cocaine base and relied on Luster's testimony to account for the balance. This is not a scenario in which the jury's finding of drug quantity is merely "surmise and conjecture." (Doc. 845 at 10 (citing *United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir. 1993))). As discussed at length above, the jury was free to credit Luster's testimony and consider it in connection with all the other evidence received.

The same is true as regards Erskine's argument in connection with the jury's finding as to the weight of cocaine involved in the narcotics conspiracy. The jury found that Erskine conspired to distribute or possessed with intent to distribute 500 grams or more but less than 5 kilograms of mixtures and substances containing a detectable amount of cocaine. (Doc. 842-1). The Government's evidence included Luster's testimony and his contemporaneous text messages

with Erskine (Tr. at 1107-1110; GX 1404) as well as proof of the amounts of cocaine recovered from other Gorilla Stone members' residences on December 1, 2020 (GX 2101), and phone calls and text messages between and among the gang members concerning cocaine sales (*see* GX 153-AT; GX 516-A; GX 1616 at 22; Tr. at 400-401, 847, 1395).

With respect to marijuana, the jury found that Erskine conspired to distribute or possessed with intent to distribute less than 100 kilograms of mixtures and substances containing a detectable amount of marijuana. (Doc. 842-1). Erskine argues that any marijuana involved in the case was related to a separate conspiracy not to enrich or further the goals of Gorilla Stone, but rather separate networks designed to enrich other Gorilla Stone members as individuals. The Government's evidence, however, demonstrated how the marijuana trafficking operation benefitted Gorilla Stone (*see, e.g.,* GX 609-AT; GX 1206; GX 1206-A; GX 1609-101; GX 1609-102; GX 1902-A; GX 1902-D; GX 1903-D; GX 1903-E; Tr. at 830) and "a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).

Accordingly, Erskine's argument concerning the insufficiency of evidence supporting the narcotics convictions, and quantity of narcotics involved, fails.

B. *Brady* Violation

Erskine seeks a new trial on the grounds that the Government allegedly violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), in connection with its failure to produce the contents of Erskine's seized Samsung Galaxy S10 cell phone. To establish a *Brady* violation, "a defendant must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to

17

disclose this evidence resulted in prejudice." *United States v. Cristobal*, No. 23-6107, 2024 WL 1506750, at *5 (2d Cir. Apr. 8, 2024). Erskine "believes that the phone has information relating to Erskine's 501(c)(3) non-profit organization, Determined Adults Exceedingly Motivating Peers Into Responsible Entrepreneurs ("D.A. E.M.P.I.R.E."), including records of video meetings from Microsoft Teams, emails and other communications to corroborate the legitimacy of D.A. E.M.P.I.R.E." (Doc. 845 at 32), and that "[if] the Samsung phone was to contain the extensive records pertaining to D.A. E.M.P.I.R.E., . . . and those records contained information that is exculpatory . . . it can hardly be argued that Mr. Erskine was not prejudiced by their suppression" (Doc. 845 at 33). Erskine has provided no basis beyond speculation that the cellphone contained any records that would be favorable to him or that the Government suppressed exculpatory evidence willfully or inadvertently.

"[I]t is well established that the Government's 'discovery and disclosure obligations extend *only* to information and documents in the government's possession.'" *United States v. Avenatti*, 559 F. Supp. 3d 274, 280 (S.D.N.Y. 2021) (quoting *United States v. Brennerman*, 818 F. App'x 25, 29 (2d Cir. 2020)). The Government has represented that it did not have possession of the contents of Erskine's Samsung phone which was encrypted. (Doc. 862 at 24-25). "[C]ourts have uniformly held[ ] the *contents* of an encrypted device are not within the Government's possession, custody, or control for purposes of Rule 16 or *Brady*." *United States v. Gray*, No. 21-CR-00713, 2024 WL 1526368, at *5 n.6 (S.D.N.Y. Apr. 9, 2024). Because the contents of the Samsung were encrypted, and the Government was under no obligation to discover information not in its possession, Erskine's contentions of a *Brady* violation fail.[4]

---

[4] To the extent Erskine is arguing that the Court denied or ignored his requests for discovery of the contents of the Samsung, that contention is belied by his own account of how his trial counsel addressed his discovery concerns together with the Government and the representations counsel made to the Court (*id.* at 29-30).

18

Erskine has failed establish that no rational trier of fact could have found him guilty beyond a reasonable doubt in order to meet the "heavy burden" associated with Rule 29 relief. *Coplan*, 703 F.3d at 62. Likewise, Erskine has failed to convince the Court that letting the "guilty verdict stand would be a manifest injustice." *Landesman*, 17 F.4th at 330. Accordingly, Erskine's motion under Rules 29 and 33 for an order setting aside the jury's guilty verdict is denied.

## CONCLUSION

For the foregoing reasons, Defendants' post-trial motions are DENIED.

The Clerk of Court is respectfully directed to terminate the pending motions: Docs. 815, 845, and 848.

**SO ORDERED.**

Dated: White Plains, New York
      May 13, 2024

_____
Philip M. Halpern
United States District Judge